UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARNETTE CALAWAY

               Plaintiff,                  CIVIL ACTION NO. 06-CV-13398-DT

        vs.                         DISTRICT JUDGE JOHN CORBETT O'MEARA

COMMISSIONER OF              MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

               Defendant.
_____/

REPORT AND RECOMMENDATION

I.      RECOMMENDATION

      This Court recommends that Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 11), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 10), and that Plaintiff's complaint be **DISMISSED**.

II.     PROCEDURAL HISTORY

      This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

      Plaintiff Arnette Calaway filed an application for Disability Insurance Benefits (DIB) in March 2003. (Tr. 45-48). She alleged she had been disabled since November 19, 2001. *Id.*

Plaintiff's claim was initially denied and she sought a review hearing before an Administrative Law Judge (ALJ), which took place before ALJ Richard L. Sasena on December 22, 2005. (Tr. 29, 276-305). Plaintiff was represented at the hearing. (Tr. 278). The ALJ denied Plaintiff's claims in an opinion issued on December 22, 2006. (Tr. 16-21). The Appeals counsel denied Plaintiff's request for review and the ALJ's decision is now the final decision of the Commissioner. (Tr. 4-6). Plaintiff appealed the denial of her claim to this Court, and both parties have filed motions for summary judgment.

III.   <u>**MEDICAL HISTORY**</u>

Medical records reflect that Plaintiff has a history of bronchial asthma, which is aggravated by noxious odors and inhaled allergens. (Tr. 98-99). EMG studies taken in 1999 of Plaintiff's upper extremities showed that Plaintiff had mild symmetrical median nerve irritation of the bilateral wrists and mild ulnar nerve irritation at the left elbow. (Tr. 245-46). Plaintiff's right ulnar nerve was within normal limits and there was no evidence of cervical nerve root irritation. *Id.*

Plaintiff was examined by Dr. Jeffrey Hall in February 2000 for complaints of occasional numbness and tingling in her left hand. An examination on February 2, 2000 showed that Plaintiff had a full range of motion in both wrists and digits and her sensations were intact. A Tinel's sign was positive on the right but negative on the left, and a Phalen's sign was positive on the left and negative on the right. (Tr. 103). Dr. Hall diagnosed mild bilateral carpal tunnel syndrome ("CTS") and symptomatic left cubital tunnel syndrome. He injected Plaintiff's left

wrist with Celestrone, advised Plaintiff to wear a night splint, and prescribed Naprosyn.  Dr. Hall also recommended that Plaintiff avoid high torque air tools at work.  *Id.*

Dr. Hall noted on February 23, 2000 that Plaintiff was doing quite well.  Her only complaint was mild swelling and soreness of her left wrist.  Plaintiff denied any numbness or tingling.  She had a full range of motion in her wrists, no thenar atrophy, and intact sensations. (Tr. 102).  A Tinel's sign was negative bilaterally and a Phalen's sign was mildly positive on the left.  Dr. Hall diagnosed Plaintiff with resolving bilateral CTS and asymptomatic left cubital tunnel syndrome.  He released Plaintiff back to work without restrictions and recommended that she wear her wrist splints at night.  *Id.*  However, that same month a doctor from Plaintiff's work restricted her to work involving no forceful gripping and grasping with either hand and no use of hammers, mallets, or sludges.  (Tr. 153).

In March 2000 Dr. Hall reported that Plaintiff had no complaints regarding her hands. Because she had driven to South Haven over the weekend her hands were a little sore. However, Plaintiff had no numbness or tingling.  An examination revealed that Plaintiff had a full range of motion, no tenderness, negative Phalen's and Tinel's signs bilaterally, and intact motor functioning.  There was a slight decrease of sensation in Plaintiff's right hand.  (Tr. 101). Plaintiff had returned to work using a mallet, which had caused swelling in her wrists.  Her work physician temporarily restricted Plaintiff to work involving no forceful gripping and grasping with either hand, no use of hammers, mallets, or sludges, no work above the shoulders, no use of torque guns, and no lifting over 10 pounds.  (Tr. 140, 141, 145).

Plaintiff returned to Dr. Hall in April 2000. She reported that given her work restrictions, her employer had placed her in an office job filing paperwork. An examination of Plaintiff's wrists was essentially the same as that from March except that a Tinel's sign was mildly positive on the right and a Phalen's sign was positive bilaterally. (Tr. 100). Dr. Hall again diagnosed Plaintiff with mild bilateral CTS and left cubital tunnel syndrome. *Id.* He advised Plaintiff to continue to wear wrist splints at night and to use anti-inflammatory medication. Dr. Hall released Plaintiff back to work with no restrictions and noted that surgery was not warranted at the time. *Id.*

Plaintiff eventually returned to work in the factory and in August 2000 she experienced an asthma attack. (Tr. 118). Thereafter, Plaintiff was restricted to work involving no direct exposure to oils, solvents, or petroleum products. (Tr. 111). Plaintiff reported continuing hand problems to her employer in October 2000. (Tr. 111, 114). She was again restricted to work involving limited gripping or grasping with either hand, no use of high torque guns, and limited use of hammers, sledges, or mallots. (Tr. 105). Work records reflect that no jobs were available with Plaintiff's employer that could accommodate Plaintiff's restrictions. (Tr. 108).

Plaintiff was treated by Dr. Ghiath Bayasi on January 21, 2002. Dr. Bayasi noted that Plaintiff had asthma, which was aggravated by working in an automobile factory. Plaintiff's condition had improved significantly once she was given environmental restrictions and removed from the factory. (Tr. 217). Plaintiff reported that she hardly used her inhaler since her removal and was currently controlling her asthma with Serevent and Flovent. Dr. Bayasi

-4-

noted that a pulmonary function test showed near normal lung function with mild restrictive airway disease.  (Tr. 217, 219-23).  He concluded that Plaintiff should remain restricted from working in the factory.  (Tr. 218).

Plaintiff was seen by Dr. Kelvin Callaway in November 2002 for complaints of an upper respiratory infection.  (Tr. 238).  He noted that Plaintiff was otherwise "doing well" and had no new concerns.  *Id.*  Plaintiff returned to Dr. Callaway in February 2003 for treatment of her left knee, which was swollen.  Dr. Callaway subsequently injected Plaintiff's knee with Lidocaine on three occasions.  (Tr. 236-37).

In April 2003 Dr. Callaway reported that Plaintiff still had "significant" CTS for which he had prescribed wrist splints.  He also noted that Plaintiff had edema in her lower extremities and was not taking her medication.  Dr. Callaway instructed Plaintiff to resume her medication immediately.  (Tr. 232).  Dr. Callaway also completed disability forms on behalf of Plaintiff.  (Tr. 233-34).  He noted that Plaintiff's asthma was aggravated by dust, smoke, fumes, and fragrances.  She had asthma attacks 2 to 3 times per year but her asthma was controlled by avoidance and medications.  (Tr. 233).  As to Plaintiff's CTS, Dr. Callaway noted that Plaintiff had a loss of grip and pinch strength bilaterally.  Her strength was 70% on the right and 80% on the left.  He further noted that Plaintiff did not have a loss of fine or gross dexterity, she could open a jar, manipulate buttons, pick up small objects, and hold a pencil with both hands.  However, Plaintiff could only write legibly with her dominant, right hand.  (Tr. 234).

A state medical consultant completed a Physical Residual Functional Capacity ("RFC") Assessment form in April 2003 after reviewing some of Plaintiff's medical records. The consultant concluded that Plaintiff could: (1) lift/carry 50 pounds occasionally and 25 pounds frequently; (2) stand/walk for about 6 hours in an 8-hour workday; (3) sit for about 6 hours in an 8-hour workday; and (4) frequently handle with both hands. The consultant noted that Plaintiff should avoid even moderate exposure to vibration and environmental pollutants. (Tr. 225-28). The consultant commented that Plaintiff had a history of a non-severe psychiatric impairment. However, Plaintiff had not alleged a psychiatric impairment as a basis for disability, was not taking any psychotropic medication, and was not limited in her daily activities. Consequently, the consultant advised that a Psychiatric Review Technique form was not being completed. (Tr. 231).

Plaintiff reported to Dr. Callaway in December 2003 that she had fallen while getting into her truck and had injured her right hand. X-rays were negative for a fracture. However, Plaintiff reported pain along the radial nerve root at the wrist and down her fingers. (Tr. 251, 262). Dr. Callaway recommended that Plaintiff wear CTS wrist splints and he prescribed medication. (Tr. 251).

In January 2004 Plaintiff saw Dr. Thomas Beird regarding her bilateral CTS. (Tr. 273). Plaintiff reported that she experienced progressively worsening numbness, tingling, and pain in her hands. An examination showed that Plaintiff had a positive Tinel's and Phalen's sign bilaterally with bilateral thenar atrophy. *Id.* Dr. Beird ordered an EMG test, which revealed

bilateral median nerve compromise involving sensory and motor fibers, which was moderately severe. (Tr. 270-72). Dr. Beird encouraged Plaintiff to undergo decompression surgery starting with the right hand. Plaintiff underwent the surgery on April 13, 2004. (Tr. 273-75). Dr. Beird noted after surgery that Plaintiff's right hand numbness was resolving "nicely" and that her pilar pain was resolving but still uncomfortable. Dr. Beird expected continued improvement and advised Plaintiff to follow-up with him in six months. (Tr. 273).

In April 2004 Plaintiff told Dr. Callaway that it was hard to walk or stand on her left ankle. Dr. Callaway reported that Plaintiff still had edema in her lower extremities and that Plaintiff had run out of some medication but had not re-filled them. Dr. Callaway advised Plaintiff to maintain her medicinal regime. (Tr. 250).

In September 2004 Plaintiff told Dr. Callaway that she had right hip pain and that her left ankle still occasionally bothered her. Dr. Callaway recommended physical therapy and medication. (Tr. 250). Tests taken of Plaintiff's right hip were normal but mild arthritis was found in Plaintiff's left hip. (Tr. 258). Subsequently, Plaintiff had a lymphoma removed from her right hip, which caused a hematoma. The hematoma was drained and her condition was resolved. (Tr. 248, 255-56).

Dr. Callaway noted in April 2005 that Plaintiff walked with a slight limp and that an MRI revealed arthritis in Plaintiff's left ankle. (Tr. 248, 254). Dr. Callaway changed Plaintiff's medication from Naprosyn, which was not effective, to Proxicam, and counseled Plaintiff on diet, exercise, and weight loss. (Tr. 248). In August 2005 Plaintiff reported to Dr. Callaway that

she was limited in her ability to lift her right arm. (Tr. 247). Dr. Callaway wrote that Plaintiff's hypertension was stable and that Plaintiff's depression, hay fever, and asthma were being treated with medications. *Id.* Tests on Plaintiff's right shoulder were suggestive of mild diastasis.[1] (Tr. 253).

IV.    **HEARING TESTIMONY**

    A.    **Plaintiff's Testimony**

Plaintiff was 45 years old when she appeared before the ALJ. (Tr. 282). She had a high school education and completed a couple years of college. (Tr. 284). Plaintiff testified that she had been unable to work since November 19, 2001 because of her bilateral CTS, asthma, and depression. (Tr. 280). Plaintiff also stated that she was currently having a problem lifting her right arm for which her doctor had ordered x-rays. *Id.*

Plaintiff testified that she did not see a psychiatrist or psychologist for her depression. Her family doctor had prescribed Zoloft, which helped. (Tr. 280, 282). Plaintiff stated that she had depression for about 3 or 4 years, triggered by work-related issues. (Tr. 281-82). As a result of her depression, Plaintiff testified that she was usually able to stay focused "real good [*sic*]". She would forget sometimes but otherwise felt good. (Tr. 295).

As to Plaintiff's CTS, Plaintiff testified that the pain radiated from her hands into her arms and shoulders. (Tr. 286). She told the ALJ that at night she would have to shake her

---

[1]    "Diastasis" is a "form of dislocation in which there is separation of two bones normally attached to each other without the existence of a true joint." *Dorland's Illustrated Medical Dictionary* 415 (24th ed. 1965).

hands to relieve the numbness in them. (Tr. 286). Plaintiff stated that the pain in her hands was constant but that if she took her medication and did not lift very much then she was fine. *Id.* She did not experience pain in her shoulders all of the time. (Tr. 290). Plaintiff described the pain as being "real tight" and achy with a lot of tension, which made "popping" sounds when stretched. (Tr. 288-89). She rated her pain as a 5 or 6 on a 10-point scale. (Tr. 289). According to Plaintiff, the pain in her hands would go away after stretching and soaking them. *Id.* Plaintiff testified that after surgery, her right hand was better than her left hand. (Tr. 286-88). Plaintiff also took pain medication for her CTS, which was usually effective. (Tr. 77, 291). Plaintiff also testified that she was usually up throughout the night because of the numbness and tingling in her hands. She would wake up and have to shake them. She usually napped during the day for one to two hours. (Tr. 294).

Plaintiff testified that her last asthma attack occurred a couple of months ago. She did not have to go to the emergency room on that occasion but instead took her medication and used her inhaler. Her inhaler was usually effective. (Tr. 291-92).

When asked about her daily activities, Plaintiff testified that she cooked every day for herself. After cooking or using the vacuum, Plaintiff needed to rest her hands. (Tr. 280). Plaintiff could hold onto more with her right hand than with her left hand. For example, she could pick up a small pan filled with water with her right hand but not with her left hand and would strain to lift a gallon of milk with her left hand but could do so with her right hand. (Tr. 290). Plaintiff testified that she was able to take care of all of her personal

needs, such as grooming, dressing, and bathing.  She could do housework at her own pace but would only do laundry once a week because carrying the basket was difficult.  (Tr. 290, 296).  Plaintiff also did the grocery shopping.  (Tr. 292).  Plaintiff went to church, attended Bible class, and sang in the choir.  (Tr. 292, 293).  She read the newspaper and an occasional book.  (Tr. 292-93).  On a typical day, Plaintiff would awaken between 5:30 and 6:30 in the morning.  She would try to walk for about an hour.  If she had a church meeting, Plaintiff would attend it.  Otherwise, Plaintiff stayed at her house or went to her mother's house.  (Tr. 293).  Plaintiff was able to drive and she could walk for 5 miles.  She could sit although her feet would swell if she sat too long.  (Tr. 293).  Plaintiff sometimes had difficulty with writing but could do it in small amounts.  *Id.*  She could pick up change from a table but it was hard to open jars and bottles.  (Tr. 294).  Plaintiff could bend at the waist but could not squat.  *Id.*

B.    <u>Vocational Expert's Testimony</u>

Roxanne Minkus, a rehabilitation counselor, testified as a vocational expert at the hearing.  (Tr. 34-37, 297-305).  The ALJ asked Ms. Minkus to testify as to what jobs would be available for a hypothetical individual of Plaintiff's age and education who was limited to medium work involving 6 hours of standing and walking per day and occasionally using her non-dominant hand for handling.  The same individual should avoid exposure to vibrating power tools and even moderate concentrations of dusts, fumes, or gases.  (Tr. 300).  Ms. Minkus testified that such a person could perform: (1) light work as an information clerk,

totaling 1,800 jobs regionally and 49,000 nationally; (2) light work as a hostess, totaling 2,100 jobs regionally and 75,000 nationally; (3) sedentary work as a cashier II, totaling 1,500 regionally and 70,000 nationally; and (4) sedentary work as a surveillance system monitor, totally 1,500 regionally and 45,000 nationally.  (Tr. 300-01).  Ms. Minkus further testified that these jobs would entail simple, repetitive job tasks and would not be affected if the hypothetical individual were limited to light work.  (Tr. 301-02).

The ALJ then asked Ms. Minkus to testify as to what jobs would be available for the same hypothetical individual if she were limited to frequent lifting of 10 pounds with the dominant hand and occasional lifting of 5 pounds with the non-dominant hand.  (Tr. 302). Ms. Minkus testified that the individual could still perform the jobs previously described although the additional limitation would eliminate office clerk jobs.  (Tr. 302-03).  Ms. Minkus also stated that each of the jobs previously described permitted a sit/stand option with the exception of the hostess positions.  (Tr. 303).

Upon questioning by Plaintiff's counsel, Ms. Minkus further testified that, generally, the maximum total time allotted for standard breaks in an 8-hour workday is 1 ½ hours. Therefore, if an individual were required to be off task for periods exceeding the standard break periods, it would be problematic in terms of employability.  (Tr. 303-04).

V.    LAW AND ANALYSIS

    A.    STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's

decisions. Judicial review of those decisions is limited to determining whether her findings are

supported by substantial evidence and whether she employed the proper legal standards.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir.

1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).

It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or

decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679,

681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the

Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human

Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the

Commissioner's decision is supported by substantial evidence, it must be affirmed, even where

substantial evidence also supports the opposite conclusion and the reviewing court would decide

the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

B.      FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

(1)     he was not presently engaged in substantial gainful employment; and

(2)     he suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity (RFC) to perform his relevant past work.

See 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work. If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." Her, 203 F.3d at 391.

C.      ANALYSIS

1.      The ALJ's Findings

The ALJ found at step one of the sequential analysis that Plaintiff had not engaged in substantial gainful employment since her alleged onset date. (Tr. 17, 20). At step two, the ALJ determined that Plaintiff had the following severe impairments: bilateral CTS, asthma, depression/anxiety, and arthritis. (Tr. 18, 20). The ALJ further found at step three that

-13-

Plaintiff's documented impairments did not meet or medically equal any listed impairments. *Id.*

At step four of the sequential analysis, the ALJ concluded that Plaintiff had the RFC to perform a restricted range of light work in which she could use her non-dominant, left hand for only occasional handling. He also noted that Plaintiff must avoid more than occasional exposure to dust, fumes, and gases and should not use vibratory tools or equipment. (Tr. 20, 21) The ALJ thereafter concluded that Plaintiff could not return to her past relevant work. *Id.*

The ALJ then proceeded to step five of the sequential analysis. Based upon the VE's testimony, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy in light of her age, education, work experience, and RFC. The ALJ therefore determined that Plaintiff was not disabled. (Tr. 20, 21).

## 2.   Plaintiff's Arguments

Plaintiff does not challenge the ALJ's findings at steps one through three. Rather, Plaintiff asserts that the ALJ's RFC finding was flawed because it failed to incorporate limitations concerning Plaintiff's: (1) ability to use her right, upper extremity; (2) difficulty in maintaining concentration, persistence, and pace caused by her depression; and (3) required daily naps, which lasted up to 2 hours. Plaintiff further contends that the hypothetical posed by the ALJ to the VE mirrored the flawed limitations set forth in the RFC finding. Consequently, Plaintiff argues that VE's testimony cannot provide substantial evidence to support the ALJ's non-disability determination.

-14-

Where an ALJ poses a hypothetical question to a VE that fully and accurately incorporates a claimant's physical and mental limitations and the VE testifies that a person with such limitations is capable of performing a significant number of jobs in the national economy, such testimony is sufficient to support a finding that the claimant is not disabled. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). In forming a hypothetical, an ALJ must incorporate all physical and mental limitations reasonably established by the record. *Id.* at 779-80. However, it is well-settled that a hypothetical "need not reflect the claimant's unsubstantiated complaints." *Blacha v. Sec.'y of Health & Human Srvs.*, 927 F.2d 338, 231 (6th Cir. 1990).

A claimant's unsubstantiated complaints will not alone establish that she is disabled. *See Walters*, 127 F.3d at 531; see also 20 C.F.R. § 404.1529(a). The Sixth Circuit has developed a two-pronged test to evaluate a claimant's assertions of disabling pain:

> First, we must examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1 986)); see also 20 C.F.R. § 404.1529(a).

Notwithstanding the above, the ALJ cannot rely solely on the lack of objective medical evidence because the regulations explicitly provide that "we will not reject your statements

-15-

about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2).  In addition to the available objective medical evidence, the ALJ must therefore consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. See 20 C.F.R. § 404.1529(c)(3); see also *Felisky v. Bowen*, 35 F .3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

Moreover, because pain is a largely subjective matter, an ALJ may properly consider the claimant's credibility in evaluating her complaints of disabling pain. *See Walters*, 127 F.3d at 531.  "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.* Furthermore, an ALJ's findings based on the credibility of the claimant are to be accorded great weight and deference.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *See id.*

a.   <u>Plaintiff's Right Arm</u>

Plaintiff asserts that the ALJ erred in not including any limitations into his RFC finding

-16-

and subsequent hypothetical regarding the use of Plaintiff's right arm.[2]  Plaintiff does not suggest what restrictions she asserts were justified by the evidence.  Rather, she merely argues that the ALJ necessarily had to find some restrictions were appropriate given Plaintiff's CTS diagnosis and her subjective complaints of constant pain in both hands and difficulty lifting her right arm.

There is substantial evidence to support the ALJ's determination that restrictions related to Plaintiff's right hand were not warranted despite her CTS.  Prior to April 2004 tests showed that Plaintiff's right median nerve was mildly irritated but that her right ulnar nerve was within normal limits. (Tr. 245).  Prior to November 2001 (the alleged onset date), examination findings reflected a full range of motion, intact sensations with the exception of March 2000, no atrophy, and intact motor functioning.  Plaintiff reported no numbness or tingling.  (Tr. 100-103).  Plaintiff's doctors continually recommended the same course of conservative treatment, including prescription medication and wrist splints worn at night. Plaintiff was not given any steroid injections for her right wrist and it was determined that surgery was not warranted. (Tr. 100, 103).  There is no indication in the record that such conservative treatment failed to manage Plaintiff's symptoms during this time period.  Furthermore, Dr. Hall only placed one temporary work restriction on February 2, 2000, which was that Plaintiff should avoid high

---

[2]      Plaintiff has not challenged the ALJ's RFC finding as it pertains to her left arm.

-17-

torque air tools.  Thereafter, Dr. Hall released Plaintiff back to work without restrictions.  (Tr. 100-103).[3]

Between November 2001 and December 2003, Dr. Bayasi's records do not reflect any complaints of wrist pain or examinations of Plaintiff's wrists.  In April 2003 Dr. Bayasi noted that Plaintiff had "significant" CTS and noted that she had a 30% loss of grip and pinch strength as to her right hand.  Yet Dr. Bayasi stated that Plaintiff had no loss of fine or gross dexterity and could open jars, manipulate buttons, pick up small objects, hold a pencil, and write legibly with her right hand.  (Tr. 232-34).[4]  Complaints regarding Plaintiff's right wrist do not appear in Dr. Callaway's records until December 2003 when Plaintiff injured her hand during a fall.  Shortly thereafter, Plaintiff reported numbness, tingling, and pain in her hands to Dr. Beird.  Dr. Beird noted that Plaintiff had thenar atrophy in her hands and an EMG showed moderate nerve compression.  Plaintiff underwent surgery on her right hand four months later, which resolved the numbness.  After the surgery, no further complaints regarding Plaintiff's wrists appear in

---

[3]     Plaintiff's work records from prior to Plaintiff's alleged onset date reflect that her employer's doctors imposed restrictions of limited forceful gripping and grasping with both hands and no lifting more than 10 pounds.  However, these restrictions were temporary.  Furthermore, there are essentially no examination findings from these doctors contained within the record that would support such restrictions.  (Tr. 104-177).

[4]     Although a state medical consultant had opined that Plaintiff should be limited to frequent handling with both hands, the record reflects that Dr. Bayasi's record had not been available to the consultant at the time he completed his RFC assessment.  Even if such records had been reviewed, the ALJ was entitled to give more weight to Dr. Bayasi's opinion.  *See* 20 C.F.R. § 404.1527(d)(2).  (Tr. 225-28, 286-87).

the record.  Based upon this evidence as a whole, the ALJ reasonably concluded that no restrictions pertaining to Plaintiff's right hand were warranted.[5]

There was no evidence to support a limitation regarding Plaintiff's right shoulder complaint.  Although Plaintiff complained of right shoulder pain to Dr. Callaway in August 2005, there were no clinical findings that demonstrated limitations in her shoulder and Dr. Callaway had not imposed any restrictions related to Plaintiff's use of her right arm. Furthermore, the x-ray taken of Plaintiff's right shoulder showed only *possible* mild diastasis with no indication that this condition would be expected to last for at least 12 months.  *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  Consequently, the ALJ properly elected not to include any restrictions related to Plaintiff's right arm.

### b.   Plaintiff's Mental Impairments

Plaintiff contends that the ALJ's determination that Plaintiff's depression was "severe" was internally inconsistent with the ALJ's RFC finding that Plaintiff had no mentally-related work restrictions.  At step two of the sequential analysis, an ALJ must determine whether Plaintiff suffers from any "severe" physical or mental impairments.  A "severe" impairment is

---

[5]        To the extent Plaintiff asserts that the ALJ should have found her disabled because she was not pain-free in her right hand after surgery, Plaintiff has cited no legal authority to support such an assertion.  *See Gossett v. Bowen,* 862 F.2d 802, 807 (10th Cir. 1988)("[t]he inability to work pain-free is not sufficient reason to find a claimant disabled.") Furthermore, Plaintiff testified that she felt "fine" if she did not lift much weight and took her medication and that she could lift a gallon of milk (8 pounds) with her right hand.  (Tr. 286).  The ALJ's RFC finding limiting Plaintiff to lifting only 10 pounds frequently is reasonably consistent with Plaintiff's testimony.

-19-

"any impairment or combination of impairments which significantly limits . . . [a claimant's]

physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c); 20 C.F.R.

§ 404.1521(a).

The Commissioner has prescribed specific rules for evaluating the severity of mental

impairments.  *See* 20 C.F.R. § 404.1520a.  The Commissioner first determines whether there is

a medically determinable mental disorder specified in one of nine diagnostic categories.  *See*

*Ibid.*; 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.00A.  The clinical findings are referred to as the

"A" criteria.  Thereafter, the Commissioner measures the severity of a mental disorder in terms

of functional restrictions, known as the "B" criteria, by determining the frequency and intensity

of the deficits.

According to 20 C.F.R. § 404.1520a(c)(3), the "B" criteria require an evaluation in four

areas with a relative rating for each area.  Thus, the Commissioner must evaluate deficits in

activities of daily living, social functioning, and persistence, concentration, or pace and rate

those on a five-point scale ranging between none, mild, moderate, marked, and extreme.  The

fourth area of deterioration or decompensation in work or work-like settings calls for a rating

of never, one or two, three, and four or more.  20 C.F.R. § 404.1520a(c).

The regulations further state that if "we rate the degree of your limitations in the first

three functional areas as "none" or "mild" and "none" in the fourth area, we will generally

conclude that your impairment(s) are not severe. . . ."  20 C.F.R. § 404.1520a(d)(1).  However,

the step two severity standard is a *de minimis* one and should only be used to filter out "totally

groundless claims." *Farris v. Sec'y of Health & Human Srvs.*, 773 F.2d 85, 89 (6th Cir. 1985); *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). Therefore, any reasonable doubts regarding the severity of an impairment should be resolved in the claimant's favor. *See Newell v. Comm'r Soc. Sec.*, 347 F.3d 541, 546 (3rd Cir. 2003)(citing to Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *4.[6]

The ALJ applied the requisite analysis and found that Plaintiff had some depression and anxiety stemming from her prior employer's inability to place her in a job with her restrictions. (Tr. 19). In applying the "B" criteria, the ALJ determined that Plaintiff's mental impairment did not affect her ability to perform her activities of daily living or to maintain social functioning and that Plaintiff had not suffered any episodes of decompensation. Plaintiff does not challenge these findings. However, the ALJ further noted that Plaintiff's medication and depression "may cause some mild to moderate impairment in her ability to maintain concentration, persistence, or pace."[7] *Id.*

---

[6]     SSR 85-28 states that "[g]reat care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process . . . should be continued.")

[7]     The basis for the ALJ's findings regarding Plaintiff's medication is unclear considering that Plaintiff did not testify or report on her disability forms that her medications caused any side effects (Tr. 77) and she did not notify her physician that her medications caused concentration difficulties.

It is clear from the ALJ's language that he did not find conclusive evidence that Plaintiff's depression had much impact upon her ability to maintain concentration, persistence, and pace. Indeed, if he had unequivocally rated the impact as only "mild", the regulations would have supported a determination that Plaintiff's depression was a non-severe impairment. Nevertheless, in accordance with SSR 85-28, the ALJ gave Plaintiff the benefit of the doubt at step two and proceeded to determine what Plaintiff could still do despite her depression when crafting his RFC finding. 20 C.F.R. § 404.1545(a)(1). "'A claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other.'" *Griffeth v. Comm'r of Soc. Sec.*, 2007 WL 444808, at * 4 (6th Cir. 2007), citing to *Yang v. Comm'r of Soc. Sec.*, 2004 WL 1765480, at *5 (E.D. Mich. 2004).

In conducting his RFC analysis, the ALJ noted that Plaintiff testified that she could remain focused despite her depression. Indeed, she testified that she "usually stayed focused real good [*sic*]" although she "forget[s] sometimes." (Tr. 295). Furthermore, Plaintiff never asserted that she could not work due to the effects of her depression until the hearing. (Tr. 57, 79, 280). The Court also notes that Plaintiff testified she did not see a psychologist or a psychiatrist for her depression but only received Zoloft from her family doctor. Plaintiff also stated the Zoloft helped. (Tr. 282). Plaintiff's daily activities form also reflects that Plaintiff was able to read books, the newspaper, and the Bible, watch television programs and movies, handle her finances in a timely fashion, attend weekly church activities such as Bible study and choir rehearsals, volunteer with a youth group, watch her grandson 6 months out of the year, and visit family.

(Tr. 81-82, 85-88).  Yet Plaintiff never indicated that she had difficulty performing these activities due to any mental limitations.  Given this information as a whole, there was substantial evidence to conclude that the Plaintiff's depression did not necessitate any mental restrictions.

Furthermore, although not ultimately included into the ALJ's RFC finding, the ALJ did ensure through the VE that Plaintiff was limited to work that entailed only simple, repetitive tasks.  (Tr. 301).  Plaintiff has not pointed to any evidence that would suggest more restrictive limitations would be appropriate.  Consequently, even if error occurred, it was harmless and would not necessitate a remand.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004), citing to *NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n. 6 (1969) ("We are not required to remand where to do so would be an idle and useless formality.")

### c.    Plaintiff's Required Rest or Nap

Plaintiff further asserts that the ALJ failed to include within his RFC finding and subsequent hypothetical a requirement that she be allowed to nap or rest at least once a day for 1 to 2 hours based upon her testimony.  According to the VE's testimony, such a limitation would have rendered Plaintiff unable to perform any work in a competitive environment.  The issue is whether the ALJ found Plaintiff's testimony in this regard credible.

-23-

The ALJ discussed Plaintiff's credibility in different sections of his written opinion. In the "Findings" section, the ALJ noted that Plaintiff's allegations were not fully consistent with the objective, clinical evidence. (Tr. 20). However, in the body of his written opinion, the ALJ commented that Plaintiff had alleged "disabling pain, fatigue, and depression." The ALJ then noted the following:

> The medical evidence documents the existence of impairments that can reasonably be expected to produce symptoms such as pain, fatigue, and depression. The intensity, persistence, and functionally limiting effects of the symptoms alleged by the claimant are generally consistent with the objective, medical evidence.

(Tr. 18-19). The ALJ never specifically discussed Plaintiff's testimony regarding her daily naps in his written opinion. However, in as much as the ALJ ultimately did not find Plaintiff disabled based upon the VE's testimony, the ALJ implicitly excluded Plaintiff's claim that she required daily naps from those which he found credible. If the case turned on the credibility of Plaintiff's testimony regarding her daily naps, remand for further consideration of that testimony might be warranted. However, given the facts of this case, remand is not necessary. Plaintiff's argument assumes that the ALJ disregarded Plaintiff's testimony regarding symptoms resulting from her medical impairments. Specifically, Plaintiff now claims that her disrupted sleep, which was caused by her CTS symptoms, necessitated daily naps. However, the causal link between Plaintiff's disrupted sleep and her daily napping was

-24-

not established at the hearing.  Rather, when asked why she napped, Plaintiff simply replied "[w]hen I just get tired . . .."  (Tr. 294).  Plaintiff also reported on her daily activities form that she only took naps "sometimes" but she did not specify why she needed them or how long they lasted.  (Tr. 79).  Furthermore, there is no reference in the medical records regarding Plaintiff's alleged medical need to take daily naps.  There is also no indication that fatigue or required napping interfered with Plaintiff's ability to perform her prior work.  Considering this information as a whole, the court cannot say that the ALJ erred in failing to specifically reference or credit Plaintiff's testimony regarding napping.  *See, e.g., Essary v. Comm'r of Soc. Sec.*, 2004 WL 2452596 at *3 (6th Cir. (Tenn.)) ("Although Essary testified that she suffered from dizziness and drowsiness as a result of her medications, Essary's medical records make no indication that Essary reported such side effects to any of her physicians. Thus, based on the record before him, the ALJ did not err in finding that Essary suffered no adverse side effects from her medications"); *Caldwell v. Barnhart*, 2005 WL 1459111, at *4 (W.D.Va,) ("There was a paucity of evidence in the medical record supporting the conclusion that plaintiff's subjective complaints constituted disabling impairments, and as such, the ALJ acted properly in according weight to the state agency physicians that he did. The ALJ correctly noted that there is no indication in the medical record that plaintiff must take a nap in the afternoon or that she has spoken with any doctor regarding her need to elevate her legs to reduce swelling.").

## VI.   <u>RECOMMENDATION</u>

The Commissioner's decision is supported by substantial evidence.  Defendant's

Motion for Summary Judgment (Docket # 11) should be **GRANTED**.  Plaintiff's Motion for

Summary Judgment (Docket # 10) should be **DENIED**, and the case should be **DISMISSED**.

Either party to this action may object to and seek review of this Report and

Recommendation, but must act within ten (10) days of service of a copy hereof as provided

for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985);

*Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections

which raise some issues but fail to raise others with specificity will not preserve all

objections that party might have to this Report and Recommendation.  *Willis v. Secretary*,

931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the*

*United States District Court for the Eastern District of Michigan*, a copy of any objection

must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: April 3, 2007                    s/ Mona K. Majzoub_____
                                        MONA K. MAJZOUB
                                        UNITED STATES MAGISTRATE JUDGE


**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: April 3, 2007                    s/ Lisa C. Bartlett_____
                                        Courtroom Deputy


-27-